UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BETTY B., ) | |
| ) | |
| Plaintiff, ) | No. 19-cv-7699 |
| ) | |
| v. ) | Magistrate Judge Susan E. Cox |
| ) | |
| ANDREW M. SAUL, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Betty B.[1] appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her disability benefits. The parties have filed cross motions for summary judgment.[2] As detailed below, Plaintiff's motion for summary judgment [dkt. 20] is GRANTED and the Commissioner's motion for summary judgment [dkt. 26] is DENIED. This case is remanded for proceedings consistent with this Memorandum Opinion and Order.

**I. Background**

    **a. Procedural History**

Plaintiff was born in 1996, making her 20 years old as of her date last insured ("DLI"), June 30, 2017. [R. 20.] Plaintiff applied for Disability Insurance Benefits on December 1, 2016, alleging a disability onset date of October 25, 2015. [R. 221-22.] On November 23, 2018, after an administrative hearing, Administrative Law Judge ("ALJ") Kimberly Cromer issued an unfavorable decision. [R. 13-21.] Plaintiff requested Appeals Council review, which was denied on September 20, 2019 [R. 1-8], causing the ALJ's November 23, 2018 decision to constitute the final decision of the Commissioner. 20 C.F.R. §404.981.

---

[1] In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by her first name and the first initial of her last name(s).

[2] Plaintiff has filed a Memorandum in Support of Motion for Summary Judgment, which the Court construes as a motion for summary judgment [dkt. 20].

Plaintiff filed the instant action on November 21, 2019, seeking review of the Commissioner's decision. [Dkt. 1.]

### b. Relevant Medical Background

In July 2016, Plaintiff went into early pre-term labor due to severe abdominal pain, abruptio placentae, and pulmonary edema. [R. 367-68, 1232.] An echocardiogram showed markedly thickened myocardium compatible with hypertrophic cardiomyopathy. [R. 368.] Plaintiff delivered twin girls via urgent cesarean section, one of whom died at ten days old. [R. 367-68, 724.] A cardiac MRI showed Plaintiff suffered from "nonobstructive hypertrophic cardiomyopathy along the anterior septum, inferior septum, and anterior wall;" maximal septal thickness of 3.2 centimeters; "significant fibrosis noted along the anterior septum and the base of the anterior wall;" and "total percentage of enhancement of 22.8% of the [left ventricle] mass." [R. 522-23.] The doctor reviewing the MRI stated that the septal thickness measurement and enhancement of the left ventricle mass were both consistent with a "high risk for sudden cardiac death." [R. 522-23.]

On December 8, 2016, Plaintiff complained of sudden onset chest pain while sitting and said it felt like someone was sitting on her chest. [R. 724.] Plaintiff's brain natriuretic peptide ("BNP") level on this date was a 241.[3] [R. 747.] On December 15, 2016, Plaintiff's doctors recommended that an implantable cardioverter-defibrillator ("ICD") be placed because she was at high risk of ventricular arrhythmias. [R. 707.] On January 11, 2017, Plaintiff had an ICD implanted in her. [R. 810-12.] On July 24, 2017, her BNP reading was 530. [R. 1004.] On August 3, 2017, a little more than a month after her DLI, Plaintiff complained about constant chest pains, shortness of breath, palpitations, and fatigue, *inter alia*, that had worsened over the past five months. [R. 1166.]

---

[3] B-type natriuretic peptide, or brain natriuretic peptide ("BNP"), is a hormone produced by the heart to regulate blood pressure and fluid balance. BNP is released in response to changes in pressure inside the heart; BNP levels increase when heart failure develops or gets worse, and go down when heart failure is stable. *See* Cleveland Clinic, *NT-proB-type Natriuretic Peptide (BNP)*, https://my.clevelandclinic.org/health/diagnostics/16814-nt-prob-type-natriuretic-peptide-bnp (last accessed Feb 16, 2021); Mayo Clinic Laboratories, *Test ID: PBNP*, https://www.mayocliniclabs.com/test-catalog/Clinical+and+Interpretive/84291 (last accessed Feb. 16, 2021).

Dr. George Mullen, M.D., F.A.C.C., F.A.C.P., Plaintiff's treating cardiologist, completed a Physical Residual Functional Capacity Medical Source Statement in November 2017. [R. 1224-27.] Dr. Mullen diagnosed Plaintiff with hypertrophic cardiomyopathy and non-obstructive diastolic heart failure [R. 1224]; explained that Plaintiff is a candidate for cardiac transplant [R. 1227]; noted that she suffers from dyspnea, chest pain, orthopnea, palpitations, nausea, dizziness, and paroxysmal nocturnal dyspnea [R. 1224]; and opined, *inter alia*, that she "cannot do sedentary work." [R. 1227.] Dr. Mullen completed a similar medical source statement in May 2018. [R. 1228-32.] Dr. Mullen also provided a supplemental August 22, 2018 opinion (which did not make it into the record) on why Plaintiff was unable to undergo a stress test, and attaching her historic labs, including her BNP levels.[4] [Dkt. 20-1, pp. 3-5.] Finally, Dr. Mullen provided an August 28, 2018 "Addendum" concerning the heart medications he prescribed Plaintiff during the relevant period. [R. 2014.]

   c. **The ALJ's Decision**

On November 23, 2018, the ALJ issued a written decision denying Plaintiff disability benefits. [R. 13-21.] At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 25, 2015 through her date last insured of June 30, 2017. [R. 15.] At Step Two, the ALJ found that Plaintiff had the severe impairments of hypertrophic cardiomyopathy with internal cardiac defibrillation with septal thickness and some diastolic issues. [R. 15-16.] At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart P, App'x 1. [R. 16.]

Before Step Four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations: no climbing of ladders, ropes, and scaffolds; no work at unprotected heights or around dangerous moving machinery; occasional balancing, stooping, kneeling,

---

[4] This August 2018 supplemental opinion is discussed in Section III(b), *infra*.

and crouching, but no crawling; no commercial driving; Plaintiff must work on a flat even surface; no concentrated exposure to vibration or temperature extremes (including humidity and pulmonary irritants); no assembly line work or tandem work. [R. 16-19.] At Step Four, the ALJ determined that Plaintiff was not capable of performing any of her past relevant work. [R. 19-20.] At Step Five, however, the ALJ found Plaintiff capable of performing other jobs existing in significant numbers in the national economy, both at the light unskilled level and the sedentary unskilled level. [R. 20-21.] Because of these determinations, the ALJ found Plaintiff not disabled under the Act. [R. 21.]

## II. Social Security Regulations and Standard of Review

In disability insurance benefits cases, a court's scope of review is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young*, 362 F.3d at 1001. Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and her conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). The Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

## III. Discussion

### a. Dr. Mullen's Opinion

Among other claims, Plaintiff argues the ALJ improperly discounted the opinions of treating physician, cardiologist Dr. Mullen. The Court agrees.

The record in this case includes four opinions from four medical sources: one from Dr. Mullen; one from a non-examining medical expert ("ME"), Dr. Todd; and one each from two non-examining State agency medical consultants, Drs. Hinchen and Dow. [R. 33-44, 81-90, 92-103, 1224-27.] The ALJ gave great weight to the opinions of the medical expert and the State agency consultants because she found them consistent with the evidence of record, "which did not indicate any significant deficits." [R. 18.] In contrast, she gave Dr. Mullen's opinion "little weight, as it is inconsistent with substantial evidence in the record and the medical expert's detailed assessment of [Plaintiff's] physical evidence…." [R. 18-19.]

Plaintiff alleges it was error for the ALJ's to have discounted Dr. Mullen's opinion because Dr. Mullen is the only medical source of record to have considered Plaintiff's congestive heart failure or her BNP levels.[5] Defendant argues this is untrue because the ME "alluded to Plaintiff's heart failure." [Dkt. 27, p. 6.] While the ME peppered the words "heart failure" throughout his testimony, a closer look at the transcript reveals the ME's uncertainty (without more information, crucially including BNP readings), on whether Plaintiff had heart failure at any given time.

Specifically, the ME's statements about his uncertainty in this case include: "[s]o [Plaintiff] definitely has hypertrophic myopathy with sometimes having heart failure although I'm not certain about that" [R. 33]; "I cannot find a BNP [reading], a brain detect type…when I look at records since then it is no BNP in the record. That's how we identify how to measure how serious it is" [R. 34-35]; "I guess I need to see [Dr. Mullin's] recent notes. I don't have recent notes. So, what he is saying about the BNP. If we can confirm that the BNP was elevated…you could list that as being supportive of [heart failure] [R. 46-47]; "the record isn't coherent completely…there is some suggestion of a problem here" [R. 47]; "[t]here's a bunch of other things I don't understand…I don't have any data I'm seeking clinical notes to

---

[5] Except for noting that Plaintiff suffered acute heart failure in July 2016, neither State agency medical consultant mentioned congestive heart failure or BNP levels. [R. 87, 100.] There seems to be little dispute Plaintiff suffered acute heart failure in July of 2016 in connection with her pregnancy; questions remain as to Plaintiff's chronic/congestive heart failure, as discussed throughout this Opinion.

5

help me understand what [Dr. Mullin's] thinking is" [R. 49]; "[w]hat is [the BNP] today? I don't know. The question is, was she in heart failure? Maybe. I don't know…[w]e need to get some BNPs and we need to understand [some of Dr. Mullin's clinical notes]" [R. 50-51].[6]

The ME twice acknowledged that a BNP reading over 150 is considered heart failure [R. 49-50], and when Plaintiff's counsel pointed out a pre-DIL February 7, 2017 BNP reading of 404, the ME testified that "that would indicate heart failure. So I see that. I can confirm that it is in the record. Yes." [R. 48 (referring to R. 915).] In fact, the record in this case showed three BNP readings during the time period at issue that were significantly higher than 150. Specifically, the record shows BNP readings of 404 on November 22, 2016, 241 on December 8, 2016, and 530 on July 24, 2017 (less than one month after the DLI).[7] [R. 735, 747, 958.]

It is apparent to the Court that the ME did not provide a conclusive opinion concerning the severity of Plaintiff's heart failure or her RFC. While the ME initially opined that Plaintiff's heart condition limited her only to light work [R. 36], the salient fact of his testimony is that, once he was apprised of *a single* markedly-elevated BNP result, he believed he had insufficient information with which to either assess Plaintiff's impairments and functional capacity or evaluate Dr. Mullen's opinion. [R. 46-47, 49, 51.] In short, the ME ultimately testified that he could not form a conclusive opinion without more information from Plaintiff's lab tests and Dr. Mullen.

---

[6] The ME also expressed uncertainty about how Plaintiff took care of her children, completed meal preparation, and went grocery shopping. [R. 36.] He testified that information regarding these topics would be helpful for him to know when forming his opinions concerning Plaintiff's RFC, because Plaintiff had not yet testified when he formed his opinions. [R. 36-37.] However, despite this gap in his knowledge on these topics, the ME went on to make unfounded, sweeping RFC statements, which were impossible for him to have opined upon. Specifically, the ME testified that "I am sure she lifts 20 pounds when she has groceries for her children, for her babies." [R. 37.] He cannot possibly have known this. In reality, Plaintiff's testimony revealed she was far more limited than the ME's unfounded assumption allowed. Plaintiff testified that that her mom woke her child, changed her diaper, gave her a bottle, and lifted her child out of her crib; that her mother went with her to the grocery store so the mother could lift the groceries and the child; that Plaintiff's ability to drive was limited by her fatigue, chest pains, and palpitations; that Plaintiff napped when her child napped; and that Plaintiff was unable to chase her child around. [R. 63-64.] The Court cannot tell the degree to which the ME's unfounded functional capacity statements influenced the ALJ. Because of these underlying factual errors in the ME's opinion, the ALJ's opinion also requires remand.

[7] Dr. Mullin's records also include BNP readings of 530 on July 24, 2017 and 402 on August 2, 2018, discussed more fully in Section III(b), *infra*. There is also a BNP reading of 500 on August 27, 2018. [R. 2013.]

It is plain from the ME's testimony just how important these BNP readings were. Near the end of the ME's testimony, the ALJ herself even recognized the BNP "labs would be very significant," and confirms that "[y]ou really would need more information on the lab work if I understand you correctly, doctor." [R. 53-54.] The ALJ even expressed that if she got updated records reflecting this critical BNP information, she "may need to do a supplemental hearing." [R. 50.]

Yet in dismissing Dr. Mullin's opinion, the ALJ failed to discuss the issue of Plaintiff's heart failure of significantly elevated BNP readings. [R. 18.] Indeed, aside from one mention of "normal BNP testing,"[8] the ALJ does not discuss Plaintiff's BNP levels indicating heart failure at all in her opinion. This is not an insignificant omission, particularly since the ALJ was put on notice of (and acknowledged) the importance of Plaintiff's BNP readings and potential heart failure issues at the administrative hearing. Not only was the ALJ aware of the significance of this line of inquiry, but the ALJ left the record open after the hearing to obtain additional documentation related to Plaintiff's BNP levels, acknowledging that she wanted to give counsel "additional time to see if we can get just a little bit clearer picture on maybe some of that lab work that may be significant." [R. 78.] Thus, the omission in the ALJ's decision of any elevated BNP levels or heart failure issues is reversible error, as she has omitted discussion of an entire potentially serious impairment. *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) ("ALJ must consider 'all relevant evidence' and may not analyze only that information supporting the ALJ's final conclusion") (citation omitted); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) ("meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence") (citations

---

[8] While the ALJ mentioned that Plaintiff "was noted to have normal BNP testing…," the ALJ provided only a string citation to 12 medical exhibits, confounding the Court's ability to determine to which record the ALJ was referring. *See Herrman v. Astrue*, 2010 WL 356233, at *12 (N.D. Ill. Feb. 1, 2010) (Judges are not "archaeologists consigned to excavating masses of paper in search of possibly revealing information that might benefit the party whose briefs provided no clue of where to dig.") (citing *Northwestern Nat. Insurance Co. v. Baltes*, 15 F.3d 660, 662-663 (7th Cir. 1994)); *See Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("We will not scour a record to locate evidence supporting a party's legal argument."). The Court finds these cases apply analogously to this matter, where the ALJ has string cited 1,050 pages of medical records instead of a pinpoint citation for a key point. Moreover, the ALJ's reference to "normal BNP testing" [R. 18] may be erroneous, as it seems from the Court's review that Dr. Mullin's records may only contain elevated BNP readings. [Dkt. 20-1, p.5.]

omitted). The ME's testimony was clear that this information was significant as it was indicative of heart failure, which then should have been analyzed bye the ALJ to determine whether Plaintiff's potential heart failure was a severe impairment. It is apparent to the Court the ALJ could not have had enough information on Plaintiff's heart failure to form an opinion on this topic and, thus, on Plaintiff's RFC. The ALJ's discounting of Dr. Mullin's opinions on these topics undermined her analysis on the other portions of her opinion, including her treatment of Plaintiff's subjective allegations and Plaintiff's RFC. Thus, the ALJ's reasoning for discounting Dr. Mullin's opinions is based on an incomplete and erroneous review of the record and it its silence on the rejection of entire lines of evidence discussed only by Dr. Mullins defies meaningful review. This matter requires remand.

### b. Dr. Mullin's Supplementary Materials

"[T]he primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant." *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) (citing 20 C.F.R. § 416.912(c) (2000)). However, "[w]hile a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (citing *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir.2000); *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir.1991)). The ALJ here attempted to further develop the record by leaving it open for Plaintiff's counsel to file additional materials related to Dr. Mullen's opinions and laboratory results. While Plaintiff's counsel filed some additional materials [R. 363, 2011-2014], they failed to file most of the BNP results and one of Dr. Mullin's supplemental letters concerning Plaintiff's heart condition. *See* dkt. 20, pp. 12-15 and dkt. 20-1.

Plaintiff's counsel seems, essentially, to blame his colleague down the hall for this filing oversight [dkt. 20, p. 14], as the same firm has represented Plaintiff throughout the pendency of her disability claim. Plaintiff's counsel has admitted that his colleagues "failed to file the actual evidence" [*id.*], which is a factual recitation of what happened, but offers no explanation (or cause) for why the failure happened.

8

The Court agrees with Plaintiff's counsel that this aspect of Plaintiff's representation leaves much to be desired [*id.*], but this unfortunate attempt to fall on their sword does not demonstrate good cause for not submitting this evidence to the ALJ and the Appeals Council. Thus, Plaintiff's argument that she is entitled to remand based on "sentence six" of 42 U.S.C. § 405(g), which allows for the incorporation and consideration of additional new evidence which is material upon a showing of good cause, fails. As such, the Court has not based its remand on these additional materials. *See Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (late submitted medical records, even if part of administrative record, cannot be used as a basis for finding reversible error).

The Court has no medical expertise, and so the Court's opinion must be informed by the medical evidence of record.[9] The record here plainly reflects a ME who is uncertain about the import of Dr. Mullin's treatment of Plaintiff and the severity of her heart condition. [*See* Section III(a), supra and R. 33-56.] Even though the ALJ "ask[ed] for and consider[ed] opinions from medical experts" on the nature and severity of Plaintiff's impairments, it is plain the ME thought the evidence was inadequate to opine on the severity of Plaintiff's heart failure or her RFC. 20 C.F.R. § 404.1527(f) (2)(3); *see also* HALLEX I-2-5-34 (ALJ may need to obtain a ME opinion when determining severity of an impairment, claimant's RFC, or if the ALJ has a question about the etiology or course of a disease or how it may affect a claimant's ability to work).

Despite Plaintiff's counsel's failure to earlier secure the additional evidence into the record in this case, this case will now be remanded for the reasons stated in Section III(a), *supra*, and fairness dictates that Dr. Mullin's supplementary materials, particularly Plaintiff's historic BNP levels, should be considered on remand along with all the other evidence. Additionally, because of the expressed confusion surrounding Dr. Mullin's treatment of Plaintiff, and because the Court, the ALJ, and the ME are all ill-suited to second-guess the judgment of medical personnel who have actually examined and treated

---

9   Similarly, the ALJ, "as a rule is not a doctor." *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982).

9

Plaintiff (*i.e.*, Dr. Mullin), the Court will urge more in this instance. Upon remand, the Court strongly suggests that Dr. Mullin be called to testify concerning his treatment of and prognosis for Plaintiff, and to answer the many outstanding questions in this regard. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir.2004) (citing 20 C.F.R. § 404.1512(e)) (ALJ is only required to re-contact medical professionals to testify if "the evidence received is inadequate to determine whether the claimant is disabled"); *see, also*, *Rodriguez v. Apfel*, 1997 WL 691428, at *6 (S.D.N.Y. Nov. 4, 1997) ("In light of the incomplete state of the record, the ALJ should have called plaintiff's physicians to further develop the case") (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 754 (2d Cir. 1982)). Instead of Dr. Mullin authoring supplementary opinion after supplementary opinion (there are already at least four in this case), his testimony should be secured; this appears to be the most direct way to form a full and fair record of Plaintiff's heart ailments. *Nelms*, 553 F.3d at 1098. Dr. Mullin's testimony should be able to clear up any remaining confusion such that the ALJ will then be able to make a well-reasoned determination on Plaintiff's heart failure and disability.

**IV.  Conclusion**

For the foregoing reasons, the Court must reverse and remand for proceedings consistent with this Memorandum Opinion and Order. At this time, the Court offers no opinion as to the other alleged bases of error in the ALJ's decision as raised by Plaintiff. Plaintiff's motion for summary judgment [dkt. 20] is GRANTED and the Commissioner's motion for summary judgment [dkt. 26] is DENIED.

Entered: 2/22/2021

_____
Susan E. Cox,
United States Magistrate Judge